Filed 6/13/16  P. v. Acosta CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G051453 |
| v. | (Super. Ct. No. 12NF1929) |
| JAIME ACOSTA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge.  Affirmed.

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

INTRODUCTION

Defendant Jaime Acosta appeals from the judgment entered after a jury found him guilty of oral copulation with a child under 10 years old and committing a lewd act upon a child under 14 years old. He contends the trial court erred by admitting evidence of statements that he made during a police interview because they were made involuntarily. Acosta contends his statements were involuntary because the police officer "deliberately minimiz[ed]" Acosta's prison-time exposure, made material misstatements of pertinent law, and extended improper promises of leniency to Acosta.

We affirm. Viewing Acosta's statements under the totality of the circumstances, Acosta's statements were made voluntarily. The trial court therefore did not err by denying Acosta's motion in limine seeking to exclude them.

FACTS

I.

FIVE-YEAR-OLD S. TELLS HER PATERNAL GRANDMOTHER ABOUT MOLESTATION INCIDENT, WHICH LEADS TO CRIMINAL INVESTIGATION.

In June 2012, five-year-old S. told her paternal grandmother that her stepfather, Acosta, had put peanut butter on his "front butt" and instructed her to lick it off. At trial, then eight-year-old S. testified that Acosta made her touch his penis with her hands and lick peanut butter off his penis; she stated white "stuff" had come out. S. was asked why she had licked Acosta's penis and she said, "[b]ecause he was the adult and I had to listen."

After S. told her paternal grandmother about what had happened, the police were contacted. Detective Stewart Hamilton and his partner, Detective Veronica Gardea, of the Fullerton Police Department's investigation unit's family crimes detail began the investigation by going to the apartment where S. lived with her mother, younger sister,

2

and a roommate. Acosta was present. It was a Sunday and Hamilton and Gardea had been called into work to investigate the case, so they were wearing civilian attire.

Hamilton asked Acosta if there was a more private place where they could talk; Acosta, Hamilton, and Gardea walked into a girl's bedroom. Hamilton asked Acosta if he would be willing to go to the police station to speak with him there. Hamilton told Acosta he was not obligated to speak with him and that it would be of his own free will. Acosta agreed to go to the police station.

Acosta drove a car to the police station, following Hamilton who was driving an unmarked police car. When they arrived, Hamilton had Acosta sit in an interview room. Before Hamilton began the interview, he reminded Acosta that he was not obligated to speak with him and was free to go at any time. Hamilton placed a small recording device on the table in plain view. The interview room was equipped to make a video and audio recording of the interview.

## II.

HAMILTON INTERVIEWS ACOSTA AND, BASED ON ACOSTA'S STATEMENTS, HAMILTON PLACES HIM UNDER ARREST.

The prosecution played for the jury the video and audio recording of Hamilton's interview of Acosta at the Fullerton Police Department.[1] Hamilton began the interview by thanking Acosta for "coming down" and stating, "I just want you to know that you're not obligated to speak to me. You're free to leave at any time. Um. I appreciate your cooperation."

Acosta stated that S. is his wife H.'s daughter and that he and H. were separated. Acosta and H. had a daughter together. H. had a roommate named Nick. Acosta had been at H.'s apartment the prior Wednesday to watch S. while H. was at

---

[1] The interview was about one hour and 15 minutes long.

3

school.  Acosta told Hamilton he had been informed of S.'s statement that Acosta "put peanut butter on [his] front end" and had her "suck it off."  Hamilton asked Acosta why he thought S. would say such a thing and Acosta said he had no idea and was surprised when he had heard it.

Hamilton told Acosta that S. had talked to H., her father, and her paternal grandmother, and that S.'s statements were consistent.  Hamilton said he was "not here to judge [him]" and that he himself had made plenty of mistakes, being human.  He told Acosta, "I think there was something inappropriate that took place, it's not the crime of the century."

Hamilton told Acosta about the "DARE" program that Hamilton had taught and how he would tell children, "we're all going to make mistakes, God know[s] I've made plenty, and, um and as long as you learn from that, and you don't make the same mistake" and "you're good, um if, if part of moving on and growing and learning" is "to say, you know what, something happened, I'm not proud of it, but I want to move on.  I want, I want my family to be good again and, right now, w[he]ther this occurred or not, there's some, there's obviously some damage."  Hamilton referred to Acosta's desire to work things out with H., but that now "there's going to be a trust issue."

Hamilton told Acosta, "some of the statements that S[.] made are very graphic in nature.  That you don't just don't make this stuff up okay."  Hamilton further stated:  "What I'm getting at is I really do believe, and I'm just being real frank with you, I really believe that something inappropriate happened.  Now, um, is it that, you know, this was a playful thing and something that she suggested, or, or was it something that you held her down and forced her into doing it?  And I don't believe that's the case, 'cause you seem like a really standup guy to me.  But I think somewhere in between there is what really took place."

4

Hamilton asked Acosta whether it was a one-time event and Acosta responded, "[i]t didn't take place, I don't do that 'cause I'm not that type of person. I love the kids."

Hamilton asked Acosta where, then, did S. get "this knowledge" of male anatomy and physiology. Acosta said he did not know and Hamilton said, "[s]he's saying, she learned it from you." Hamilton asked, "did Nick witness this, is he aware of this incident" and Acosta responded, "[n]o, Nick hadn't seen nothing. Nick walks in and out when he goes to smoke."

Hamilton asked, "[t]o smoke? Oh, okay. Um, well I, I don't[] think you're being completely honest with me and I'm just really worried for your sake because if, let's say, if this continues and this goes to court and, and you know it, and the report it says, you know he continues to lie, continued to lie, yet we have this evidence, we have these statements to indicate that it really did happen, so is it like I said before, was it a case of playful thing, I didn't mean anything by it, it got out of hand, it was a one-time event, it's not going to happen again, or is it something that's been occurring for a period of time and there was force involved, because that makes it a serious thing and, and so if, if . . . my report reflects that, well, you know what, yeah it happened, it was a one-time event, it was a playful thing she kind of encouraged it, she, you know, that's a whole different scenario so it, if, if, you know, you want to sit here and continue to tell me that this precious little five-year-old is a liar, is she a liar?"

Acosta stated, "[t]here's tim[es] that she lies" to "get attention." Hamilton expressed doubt she would report that Acosta had put peanut butter on his penis and had her lick it off to "five individuals" to get attention. Hamilton stated, "I don't think you're being honest with me. So not, with you not being honest with me, like I said before, I want to believe that you're an upright guy who made a simple mistake, like I said we all do, um, but not I don't know if you're lying about it, then maybe there's a history to it, there's a pattern to it, this has been escalating and building up. Is that the case?"

5

Acosta asked for clarification on what Hamilton meant by "building up." Hamilton said, "have you been touching her inappropriately for months now and then this happened, or is this, was this a one-time event? Like I said before I'm, I'm going to be completely truthful with you, I don't believe you're being honest with me, I know that it happened okay. I'm, I'm, we're also gathering evidence to indicate . . . right? You know about DNA right?" Hamilton asked Acosta if he could say with certainty that his semen would not be found on S.'s clothes. Acosta said his semen would not be found on her clothes and he would be willing to provide a DNA sample.

Hamilton responded: "Alright. Um, and hopefully that's the case. I've been doing this for nineteen years and I've been working on this unit for about four and a half and, um, I'd love for it to be that I'm wrong, but I've done this a long time and I, and I really don't believe that I'm wrong okay. Um, and like I said before, I'd like to be able to put in my report that, yeah, you know what, he feels remorseful, and he guarantees me that this type of behavior is not going to continue. That's going to go pretty far if, if it comes to the point of going to court. If you continue to say, no, no, no, lie, lie, lie and then we have the DNA evidence to prove it, you know, we have this little girl's statements from these five different people I guarantee you, by the time that [t]his gets any further, she'll be interviewed by a forensic specialist who does nothing but interview children, um, and then to find out that you lied about it, it's not going, it's not going to bode well for you. I hate, I ha[t]e to see that happen." Hamilton added, "[y]ou know because I think by, by denying this, you're just digging a deeper hole, you know what I mean?" Hamilton also told Acosta that he had been showing signs of nervousness "since the moment I met you at the house."

Acosta asked Hamilton, "[c]an we speak off record right now? And after talking off record, I'll say something." Hamilton clarified, "[w]ant me to turn this off," while gesturing to the small recording device on the table between them. Acosta responded in the affirmative. Hamilton stated, "I'll turn it off for you. Alright. It's off."

Hamilton and Acosta engaged in the following dialogue, recorded by the video and other audio equipment in the room.

"ACOSTA:  If, what needs to happen if we do go to court and they say that I lied?  Okay.  Or if I say that it had, had, actually did happen, what would happen from here and on?

"HAMILTON:  You know I, I, I'm just a worker bee.

"ACOSTA:  I know.

"HAMILTON:  I, I don't, I don't work for the DA's Office . . .

"ACOSTA:  Uh-huh.

"HAMILTON:  . . . I'm not a Judge.  I, I, I don't see, I just, I can't, I don't have a crystal ball, I can't tell you . . .

"ACOSTA:  Okay.  From your experience, what have you seen?

"HAMILTON:  Clarify that.  What do you mean by that?

"ACOSTA:  Say, say, you've done this for a while, what have you seen in cases of this magnitude?

"HAMILTON:  You know, I handle all different kinds of cases.

"ACOSTA:  Yeah.

"HAMILTON:  Okay.  Um, when, when, when people continue to lie and continue to lie, I mean, put yourself, put yourself in, in a District Attorney's shoes, put yourself in, in a Judge's shoes, or in a jury's shoes . . .

"ACOSTA:  Hmm.

"HAMILTON:  Oh, he, he doesn't even feel remorseful?  He's been, he, he lied about this?  That means that this is gonna continue . . .

"ACOSTA:  Hmm.

"HAMILTON:  . . . this means he's a, he's a pedophile and, and, you know, he, he, he may need to go away for, for life, he may need to go away for 25 years . . .

"ACOSTA:  Uh-huh.

7

"HAMILTON: . . . you, you know.  And somebody, and once again I, I'm, I can't, I can't promise anything . . .

"ACOSTA:  I know you can't promise anything, I just want . . .

"HAMILTON:  But, but, um, you know, if, if someone shows that they're remorseful . . .

"ACOSTA:  Uh-huh.

"HAMILTON:  . . . um, I think human nature would show that hey it's, he feels bad.  This is, this stuff, this kinda thing's not gonna happen again.

"ACOSTA:  Uh-huh.

"HAMILTON:  You know what I mean.

"ACOSTA:  Hmm.  Yeah, 'cause right now this is gonna, 'cause it is so bad 'cause it'll ruin, ruin my, it's gonna ruin my job.  It's gonna ruin a lot of stuff for me.

"HAMILTON:  Right.

"ACOSTA:  And this is so bad.  And I don't wanna lose everything.

"HAMILTON:  I get that.

"ACOSTA:  Uh-huh.

"HAMILTON:  But do you, you wanna live a lie and then have consequences anyway?

"ACOSTA:  Hmm.  *** it's hard to say.

"HAMILTON:  Right.

"ACOSTA:  I love H[.].  I love my daughter.  I don't want to ***

"HAMILTON:  And I do, I know you do.

"ACOSTA:  Right.

"HAMILTON:  You seem like a good guy.  And like I said before . . .

"ACOSTA:  Uh-huh.

"HAMILTON:  We're humans right?

"ACOSTA:  Yeah.

8

"HAMILTON:  We make mistakes.  Trust me.

"ACOSTA:  Uh-huh.

"HAMILTON:  I've made plenty in my day . . .

"ACOSTA:  Uh-huh.

"HAMILTON:  . . . you know, and like I said before, just like I tell, we tell those sixth grade children, you make the mistake, you own up to it . . .

"ACOSTA:  Uh-huh.

"HAMILTON:  . . . and that's a part of bein' a man.  And, and then . . . you move on . . .

"ACOSTA:  Uh-huh.

"HAMILTON:  . . . and, and you, you come out and say, you know what, I screwed up, this is not, I guarantee it's not gonna happen again.

"ACOSTA:  Uh-huh."  (Original ellipses.)

Hamilton told Acosta that H. wanted to trust him but if he were to continue "this lie," she was not going to trust him.  Hamilton suggested to Acosta, "if you could go to H[.] right now and say look, sweetie, I screwed up" and "I feel horrible and, and I, and I want your forgiveness, um, I, I want S[.]'s forgiveness."  Hamilton then asked if alcohol was involved and Acosta said "[n]o."  After confirming Acosta did not "smoke weed or anything," Hamilton said, "[b]ut nevertheless, um, we have hormones, you know, things, our minds wander" and "things happen."  Hamilton asked Acosta whether it was his idea and the peanut butter was involved to entice S.  Hamilton also told Acosta that he "had to know that she was gonna tell."

Hamilton and Acosta's dialogue continued as follows.

"ACOSTA:  . . . I don't know what to say.  'Cause the—, there's *** I'm gonna lose everything.

"HAMILTON:  Well, not, not necessarily.

"ACOSTA:  Hmm.

9

"HAMILTON: Not necessarily.

"ACOSTA: Hmm. Hmm. Probably get some jail time and ***

"HAMILTON: Maybe. I, I don't have a crystal ball . . .

"ACOSTA: Well, I know that.

"HAMILTON: . . . I can't make, like I said before I can't make any promises. You came down here on, on your free will to talk with me. I told you that you were free to go.

"ACOSTA: Uh-huh.

"HAMILTON: I appreciate your honesty. I, I feel like I'm really close to being able to write my report.

"ACOSTA: Uh-huh.

"HAMILTON: And say, you know what, it's obvious that [Acosta] knows he screwed up and he was honest with me and, and, and he, he wants to ensure that this type of behavior doesn't continue. He wants to be around to make sure that those girls are not harmed by, by anybody else.

"ACOSTA: Uh-huh.

"HAMILTON: Okay? You're there to protect them.

"ACOSTA: Uh-huh.

"HAMILTON: Right?

"ACOSTA: Uh-huh.

"HAMILTON: And one of the ones that you're there to protect, you let her down.

"ACOSTA: Uh-huh." (First ellipsis added.)

Acosta told Hamilton it was a one-time event. He said it happened in the living room and that he had used a peanut butter packet. He told Hamilton that the ejaculate went "nowhere near her." After more questions, Hamilton placed Acosta under arrest and read him his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

10

Hamilton asked Acosta whether there "was a time with the peanut butter and a time without" because S. had said it occurred twice.[2]  Acosta said it happened only once with the peanut butter and he did not put his penis in her mouth but that it was "[j]ust a lick."

## III.

### DEFENSE EVIDENCE

A test conducted on pants found at S.'s apartment did not show the presence of semen.  H.'s roommate, who had been home the night of the molestation, testified he did not see anything unusual.

An expert neuropsychologist conducted a five-hour neuropsychological assessment of Acosta and testified that Acosta has a "dependent personality style" and was considered "on the edge for what we call dependent personality disorder" which involves "folks that are less assertive.  They are easily coerced.  They avoid confrontation.  They are more passive in their behavior.  Lower self-esteem."  He further testified, "[i]f you are not a confrontational person, you are more likely to give in sooner."  The expert found that Acosta had an average intelligence quotient, and did not find he had any neurological impairments.

## PROCEDURAL BACKGROUND

Acosta was charged in an information with oral copulation with a child 10 years old or younger, in violation of Penal Code section 288.7, subdivision (b) (count 1), and committing a lewd act upon a child under 14 years old, in violation of Penal Code section 288, subdivision (a) (count 2).

Acosta filed a motion in limine seeking the exclusion of his statements to Hamilton during his interview at the Fullerton Police Department.  He argued his

---

[2] S. had told Gardea that the same thing "happened twice on the same day.  One with peanut butter.  One without."

11

statements were the product of police coercion because they were made in a custodial setting without the benefit of an advisement under *Miranda*, and were not knowingly, intelligently, and voluntarily given.

The trial court viewed the video recording of Hamilton's interview of Acosta and after conducting a hearing, the court denied the motion. The court thoughtfully set out its findings and reasoning on the record. The trial court found that Acosta was not in custody for purposes of *Miranda* until he was arrested. The court observed that Acosta was willing to, and did, drive to the police station to speak with Hamilton, Hamilton was wearing plain clothes, Hamilton informed Acosta he was free to leave, and Acosta had access to his cell phone.

The trial court stated that Acosta's argument regarding the voluntariness of his statements was his "stronger argument." Citing *People v. Holloway* (2004) 33 Cal.4th 96, the court stated the video recording reflected "a very casual conversation" between Hamilton and Acosta. The court noted "Detective Hamilton never in his tone implies that he is angry or forceful with the defendant. He appears to be having a conversation where they're both able to communicate. There was nothing about that conversation that leads the court to believe that the free will of the defendant was overcome or that he was, in fact, promised something implicitly or threatened implicitly or explicitly under either of those scenarios. [¶] Rather, the officer was informing him honestly as to what would happen in terms of relaying the information, and the fact that individuals can take into consideration remorse. But he wasn't promising him with any particular result or threat. [¶] The court believes that the defendant did voluntarily make the statements of admission not because of any conduct of the officer."[3]

---

[3] The court noted that the portions of the interview, on which Acosta relied in support of his motion in limine to show his statements were made involuntarily, "are the statements that, of course, would make the court cringe if looking at them by themselves—and I say that not because I think that they were the type that rendered this

12

The jury found Acosta guilty as charged on both counts. The trial court sentenced Acosta to 15 years to life in state prison by imposing a term of 15 years to life on count 1, and the middle term of six years on count 2, to run concurrently to the sentence imposed on count 1. Acosta appealed.

## DISCUSSION

Acosta contends the trial court erred by admitting evidence of his statements to Hamilton because they were involuntarily made. He contends the admission of that evidence violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution. Although some of Hamilton's statements make this a closer call, we conclude that under the totality of the circumstances, Acosta's statements were voluntarily made and properly admitted at trial.

### I.

APPLICABLE LEGAL PRINCIPLES AND STANDARD OF REVIEW

"Both the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial. [Citations.] '"A statement is involuntary if it is not the product of '"a rational intellect and free will."'" [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.'"'" [Citations.] [¶] '"A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.] Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked. [Citation.]"

involuntary, but as I said, it's always better if there's zero issues regarding that rather than an issue."

13

[Citation].' [Citation.] A confession is not rendered involuntary by coercive police activity that is not the 'motivating cause' of the defendant's confession. [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1176.)

"'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made.' [Citation.] 'Whether a confession was voluntary depends upon the totality of the circumstances.' [Citations.] 'On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence.' [Citation.] The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review. [Citation.]" (*People v. Linton*, *supra*, 56 Cal.4th at pp. 1176-1177.)

Under both state and federal law, relevant factors in determining the question of voluntariness of a confession, by applying the totality of circumstances test include """"'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.'"""" (*People v. Boyette* (2002) 29 Cal.4th 381, 411.)

## II.

### THE TOTALITY OF THE CIRCUMSTANCES SHOW ACOSTA'S STATEMENTS WERE MADE VOLUNTARILY.

Acosta argues that "viewed under the totality of the circumstances, [his] recorded statement, without the benefit of proper legal advice or any *Miranda* warning" (italics added)[4] was made involuntarily because Hamilton (1) deliberately minimized Acosta's prison-time exposure; (2) made "material misstatements of pertinent law"; and

---

[4] Acosta does not argue that his statements were inadmissible because he had not been advised of his *Miranda* rights.

14

(3) made "improper promises of leniency."  Viewing Hamilton's statements in context, they were "not '"of a type reasonably likely to procure an untrue statement"'" (*People v. Jones* (1998) 17 Cal.4th 279, 299), and did not render Acosta's statements to Hamilton involuntary.

Acosta argues Hamilton improperly minimized Acosta's prison-time exposure and, in so doing, misrepresented the law.  Hamilton referred to S.'s report of what had happened as "not the crime of the century."  After Acosta asked Hamilton to speak off the record and asked him about what happens if "it had, had, actually did happen," Hamilton immediately explained to Acosta that Hamilton is only a "worker bee," does not work for the district attorney's office, is not a judge, and does not have a crystal ball.  When pressed by Acosta about what Hamilton had seen in his experience with cases like this, Hamilton told Acosta to put himself in the district attorney's, a judge's, or a jury's shoes in viewing someone who continues to lie.  Hamilton stated that a person who is not remorseful would continue the conduct and is a pedophile who "may need to go away for, for life, he may need to go away for 25 years."

When Acosta told Hamilton that he did not know what to say because he was "gonna lose everything," Hamilton responded by saying "not necessarily," which did not foreclose the possibility that Acosta would lose everything, whatever that means, depending on what Acosta would admit to.  When Acosta said, "[p]robably get some jail time," Hamilton responded, "[m]aybe.  I, I don't have a crystal ball."

Hamilton did not know what Acosta was about to confess, including the surrounding circumstances.  Specifically, he did not know that Acosta would admit to conduct that qualifies as oral copulation with a child under 10 years old in violation of Penal Code section 288.7, subdivision (b), which carries a mandatory 15-year-to-life prison term.  He did not know Acosta would admit to this general intent crime to which playfulness, single molestation, and remorse are not defenses. Although Hamilton's statements were intended to make Acosta comfortable and encourage him to reveal the

15

truth of what had happened with S., they did not minimize Acosta's criminal liability exposure so as to render Acosta's confession involuntary.

Acosta argues Hamilton employed psychological tactics (as he admitted at trial) to encourage Acosta to confess and his statements "came <u>directly on the heels</u>" of those tactics. Acosta further argues those tactics included proscribed "direct or implied promises, however slight." As a result, Acosta asserts he "was 'given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement.'"

In *People v. Smith* (2007) 40 Cal.4th 483, 505-506, the California Supreme Court held the defendant's incriminating statements to police were not rendered involuntary because the police officers falsely told him that they had conducted a test which showed the defendant had recently fired a gun. The Supreme Court stated, "[p]olice deception 'does not necessarily invalidate an incriminating statement.'" (*Id.* at p. 505.) In *People v. Jones*, *supra*, 17 Cal.4th at pages 297-298, the California Supreme Court stated: "'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.'"

Acosta has failed to identify a single promise that Hamilton made, except Hamilton's general suggestion that telling the truth has its benefits. Hamilton alluded to such benefits as including the potential of restoring trust with loved ones, healing family relationships, possibly making a positive impression on decision makers, such as juries or judges, and possibly reducing the chance others might think Acosta was guilty of conduct that was worse than what had actually happened. Hamilton repeatedly told Acosta that he could not make any promises to him. Acosta has also failed to show that any psychological ploy, utilized by Hamilton during the interview, had a causal connection to Acosta's decision to confess.

16

In his opening brief, Acosta also argues the record shows he was not a "sophisticated criminal defendant," given, inter alia, that he had no prior criminal record, asked to speak off the record, and inquired about his potential criminal liability and police and court procedures. He also argues that he made his statements without the benefit of any attorney's advice and receiving *Miranda* warnings.

Although Acosta was unfamiliar with the criminal justice system and with police, jail, and court procedures, "the record does not even hint that these factors came into play in this case," to bear on the question whether his statements to Hamilton were voluntary. (*People v. Boyette*, *supra*, 29 Cal.4th at p. 412 [rejecting the defendant's claim that his youth, lack of educational achievement, modest level of literacy, and unfamiliarity with the legal system rendered his confession involuntary].) Acosta's expert witness testified that Acosta had an average intelligence quotient and no neurological impairments. Acosta does not argue that he did not understand the proceedings or Hamilton's questions during the interview, or otherwise show the existence of any factor that resulted in him making involuntary statements during the interview.

Acosta argues the trial court erroneously relied on *People v. Holloway*, *supra*, 33 Cal.4th 96, which, he contends, is "wholly inapposite." The trial court acknowledged distinguishable aspects of that capital case, including the fact that in *People v. Holloway*, the defendant had been read his rights under *Miranda* before making incriminating statements. In *People v. Holloway*, the California Supreme Court held, inter alia, that "'[i]t is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. [Citations.] However, *mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary.* . . . Thus, "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a

17

truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made.  [Citation.]'"  (*People v. Holloway*, *supra*, at p. 115, italics added.)

Upon our independent review of the totality of the circumstances (*People v. Boyette*, *supra*, 29 Cal.4th at p. 412), we conclude Acosta's statements to Hamilton were made voluntarily.  The trial court therefore did not err by admitting evidence of them at trial.


DISPOSITION

The judgment is affirmed.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


IKOLA, J.